UNITED STATES DISTRICT COURT
NORTHERN DISTRICT INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| Q.C. ONICS VENTURES, LP, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) CASE NO. 1-04-CV-138-TS |
| | ) |
| JOHNSON CONTROLS, INC., | ) |
| | ) |
| Defendant. | ) |

**OPINION**

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed on September 1, 2005. The Defendant argues that the Plaintiff's claim for breach of contract must be dismissed because the contracts between the parties are integrated and give the Defendant the right to terminate the agreements at any time. The Plaintiff responded on October 21, 2005, arguing that the contract was a requirements contract and the Defendant terminated the contract in bad faith, in violation of Michigan's version of the Uniform Commercial Code (UCC). The Defendant replied on October 24, 2005. Oral argument was held on several issues raised by the Plaintiff regarding what terms were included in the parties' contracts on March 30, 2006. For the reasons stated below, the Court grants summary judgment for the Defendant on the Plaintiff's breach of contract claim.

**A.      Standard for Summary Judgment**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In

other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party

cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

B. **Material Facts**

Plaintiff Q.C. Onics Ventures, LP, manufactures wire harnesses and other parts for the auto industry. In 1998, Defendant Johnson Controls, Inc., began purchasing large quantities of parts from the Plaintiff when a former supplier went bankrupt. No formal contract awarding the business to the Plaintiff was signed; rather, the parties entered into separate contracts for each part. When it decided to begin contracting with the Plaintiff, the Defendant sent an e-mail to the Plaintiff stating that the Defendant intended to award business to the Plaintiff, and that purchase orders would soon be sent out:

> As we go forward, and you prepare to make [sic] commit funds (outside of the usual risks you take in the normal course of doing business—and outside of any specific purchase orders we have/will issue to you), please communicate with us your intent before you act so we can give you the written permission to proceed (Purchase Order or some other written document).

(Compl., Ex. A, DE 1.)

The way by which the parties entered into contracts was as follows: First, the Defendant would inform the Plaintiff of its need for a part and request from the Plaintiff a quote as to what the price to manufacture the part would be. These requests for quotes were sent to numerous potential suppliers. The Plaintiff would analyze the specifications for the requested part and provide the Defendant with a formal quote. (Dep. Stephen Davis 91–92, DE 102, #4.) Many of the quotes set forth long-term pricing structures over several years. (Dep. Larry Smith 41–42, DE 102, #2.) The quotes set forth the part number and description along with the price per unit and estimated units for a given year. (Example Quotation of August 7, 2000, DE 102 #6.) The quotes could be for a number of years, depending on the expected life of the part, up to ten years. (Dep. Larry Smith 42, 62, DE 102, #2.)

After examining the quotes, Defendant would select a supplier and issue a purchase order to the supplier for the part. (Dep. Larry Smith 32–33, DE 102, #2.) For some jobs, where there was no long term price agreement in place, the Defendant would not issue any purchase order. (October 3, 2000, Request for Quote, Pl. Ex. F, DE 102.) Generally, there was only one supplier for each part. (Dep. Stephen Davis 95, DE 102, #4.) The Defendant's purchase orders required the seller to supply the Defendant with all of its requirements for the part. (Purchase Orders of Aug. 8, 2000, Nov. 11, 2000, & Jan. 11, 2000, DE 102, #8, #9, #10 (stating "scheduled Purchase Order to cover 100% [Defendant's] requirements").) The purchase orders also stated the estimated annual units for the part and the price of the part. *Id.* The backside of each purchase order consisted of one of two forms. (Reverse Side of Purchase Orders of Nov. 11, 2000 & Jan. 11, 2000, DE 102, #11, #12.)

The first type of purchase order contained the following clauses stating the purchase order was the complete agreement between the parties, and that the Defendant (the purchaser) had the right to terminate the agreement:

> 2. The Contract
> . . .
> b. Complete Agreement. This purchase order, including all items incorporated herein by reference, contains the final and entire contract between Purchaser and Seller, and no agreements or other understanding purporting to add to or modify the terms and conditions hereof shall be binding upon Purchaser unless agreed to by Purchaser in writing on or subsequent to the date of this purchase order.
> . . .
>
> 7. Termination at Option of the Purchaser.
> a. Production of goods under this purchase order may be terminated in whole or in part, by Purchaser at any time by mailing or delivering written notice of termination to Seller.
> b. After receipt of a notice of termination and unless otherwise directed by Purchaser, Seller shall:
> . . .
> > 6. Submit to Purchaser not later than three months from the effective date of termination (one month in the case of partial termination), its termination

claim; provided, however, that in the event of failure of Seller to submit its termination claim within such period, Purchaser may determine, notwithstanding the provisions of sub-paragraph (c) hereof, on the basis of information available to it, the amount, if any, due Seller with respect to the termination and such determination shall be final.

(Reverse Side of Purchase Orders of Nov. 11, 2000, DE 102, #11.) Paragraph 7 of the purchase order goes on to state how claims are to be settled and business is to be wrapped up upon the termination of the purchase order, and included a provision at subsection (c) of paragraph 7 that listed which expenses of the seller the purchaser would pay for. However, the Plaintiff is not seeking damages for a failure to pay the expenses the purchase orders state the purchaser will pay when exercising the termination clause. These costs were settled following the termination of the contracts and are not at issue: "None of the charges set fort in Paragraph 7(c) have any relation to the breach of contract and lost profits damages claimed by Q.C. Onics in this action." (Pl. Br. 25, DE 102.)

The second type of purchase order contained similar clauses:

Acceptance and Modification of Agreement
This purchase order (PO) becomes a binding contract subject to the terms and conditions hereof, when accepted by delivery of acknowledgment to Purchaser or by delivery of materials in whole or in part, any acknowledgment form or other form of Seller containing terms and conditions of sales shall not have the effect of adding to, modifying, or deleting the terms and conditions hereof. Any addition to modification of or deletion from this PO to be valid, must be in writing and signed by Purchaser's authorized representative. "It is the specific intent of the buyer that the only contract with the supplier is that found in the terms of this purchase order, unless so modified."

. . .

Termination
Purchaser may terminate this PO, in whole or in part, by written notice of termination whereupon Seller will terminate pursuant to the notice all work started under the PO. Seller will promptly advise Purchaser of the quantities of applicable work and material on hand or purchased prior to termination and the most favorable disposition that Seller can make thereof.
Payment made under this clause will constitute Purchaser's only liability in the event this PO is terminated as provided herein. Seller's acceptance of such payment will constitute an

6

acknowledgment that Purchaser has fully discharged such liability. In addition to all rights and remedies conferred on the Purchaser here under, that Purchaser shall have all of the rights and remedies provided by the Uniform Commercial Code. The provisions of this clause will not apply to any termination by Purchaser for default by Seller or for any other cause allowed by law or under this PO.

(Reverse Side of Purchase Order of Jan. 11, 2000, DE 102, #12.)

The Defendant issued hundreds of purchase orders to the Plaintiff. (Dep. Larry Smith 58–59, DE 95, #2.) The Plaintiff states that it was its understanding that the contract for the sale of the parts was not made up solely by the terms of the purchase orders, but by the purchase orders coupled with the corresponding price quotations. (Dep. Larry Smith 33, 35, DE 102, #2.)

In July 2001, the Plaintiff received notice from the Defendant that the Defendant was terminating its business relationship with the Plaintiff. The letter stated: "At this time, JCI has elected to shift the business currently at QC Onics to another supplier, Exemplar. JCI plans to fully exit from the QC Onics manufacturing facility by December 1, 2001." (Letter to Larry Smith from Stephen Davis and Pamela Moore, July 25, 2001, DE 102, #13.) The letter does not state why the Defendant terminated its relationship with the Plaintiff.

### C. Terms of the Contract

The parties agree that Michigan law controls this dispute, and because this dispute relates to the sale of goods, Michigan's Uniform Commercial Code applies. Mich. Code § 440.2102. Michigan courts interpreting uniform laws often look to decisions from other jurisdictions for guidance. *Check Reporting Servs, Inc. v. Mich. Nat'l Bank-Lansing*, 478 N.W.2d 893, 898 (Mich. Ct. App. 1991); *Metro. Alloys Corp. v. State Metals Indus., Inc.*, 416 F. Supp. 2d 561, 566 (E.D. Mich. 2006).

There is no dispute as to whether the parties have an agreement. To determine what the terms of the contracts are, the Court must determine which documents constitute offers and which are acceptances. The Plaintiff argues that their price quotations constituted offers to the Defendant, and that the Defendant's purchase orders were acceptances, and that a battle of the forms analysis applies under Mich. Code § 440.2207. The Defendant disagrees, arguing the price quotations were not offers, and that its purchase orders were offers, and therefore, the terms of the purchase orders were the terms of the contract.

"An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Eerdmans v. Maki*, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997) (quoting Restatement 2d *Contracts* § 24). Where the parties use standardized forms, a court must look beyond the words and examine the totality of the circumstances. *Challenge Mach. Co. v. Mattison Mach. Works*, 359 N.W.2d 232, 235 (Mich. Ct. App. 1984). Generally, a price quotation is not an offer. *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 650 (E.D. Pa. 2002); *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999). Rather, "[p]rice quotations are a daily part of commerce by which products are shopped and commercial transactions initiated. Without more, they amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts."*Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 259 (4th Cir. 2000). The determination of whether a price quotation is an offer "depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances."*Dyno Const. Co.*, 198 F.3d at 572.

It is the Court's determination that the price quotation is not an offer. Negotiations would

8

begin with the Defendant's request to various suppliers for price quotations. After considering the Defendant's specifications, the Plaintiff and other suppliers would submit price quotations with a proposed price, usually for a number of years. The Plaintiff's price quotations were one page documents setting forth the part's number and description along with the price per unit and estimated units for a given year. The top of the forms stated "YOUR REQUEST," apparently to signify it was in response to a request for a price quotation from the Defendant. (Q.C. Onics Price Quotation, Exhibit F, DE 102.) The price quotation also stated a shipping term: "F.O.B. OUR PLANT." (Q.C. Onics Price Quotation, Exhibit F, DE 102.) The price quotations contained no language suggesting them to be offers or inviting acceptance. There was no mention of payment terms, time by which the offer must be accepted, timing of performance, or warranties. Significantly, the price quotations do not reference the quantity term—JCI's requirements—that both parties agree was a term of their agreements. If the price quotation was an offer, and the UCC battle of the forms analysis applied as argued by the Plaintiff, the requirements term would be knocked out, leaving no quantity term. Other important material terms other than the termination clause may also be knocked out, leaving a contract much different than what the parties expected or intended. There was little about the Plaintiff's price quotations to suggest the Plaintiff intended the price quotations to be offers, excluding them from the general rule that price quotations are not offers.

The parties' conduct and the surrounding facts and circumstances do not suggest that the parties considered the price quotations as offers. In fact, the evidence suggests that the price quotations were never considered as offers by the Plaintiff until after the start of this litigation. There is no evidence that any of the terms in the purchase orders were disputed by the Plaintiff until after the start of this litigation, even though hundreds of purchase orders were used. The Plaintiff's

9

Complaint made no mention of the price quotations, and did not attach the price quotations to its Complaint, but an example Purchase Order was attached. Because the price quotations were so lacking in detail, and there is little from the surrounding facts and circumstances suggesting that they were offers, the Defendant would not have been reasonable in thinking that a price quotation gave them the power to accept the price quotation and create a contract. Thus, the Court finds that the price quotations were not offers.

The Plaintiff argues that this case is like *Challenge Machinery Co. v. Mattison Machine Works*, 359 N.W.2d 232, 235 (Mich. Ct. App. 1984). However, a comparison of the Plaintiff's price quotation to the one in *Challenge Machinery* shows clear differences. The contract in that case was for a large piece of machinery. Negotiations had been ongoing for four months when the seller sent a final price quotation to the buyer. The price quotation stated "WE PROPOSE TO FURNISH THE MATERIAL SPECIFIED BELOW AT THE PRICES QUOTED AND SUBJECT TO THE TERMS AND CONDITIONS STATED ON THE REVERSE SIDE OF THIS FORM WHICH ARE HEREBY EXPRESSLY MADE A PART OF THIS OFFER." *Challenge Mach. Co.*, 359 N.W.2d at 234. The price quotation included the company's terms and conditions of sale. The terms and conditions included a provision stating the sale was subject only to the terms and conditions of the price quotation. It also included provisions limiting liability to replacing or repairing parts that disclaimed all other express and implied warranties and liability for consequential damages. *Id.* The *Challenge Machinery* court held this to be an offer. The factors that make the price quotation in *Challenge Machinery* are all lacking here. The price quotations here were much less detailed and did not refer to themselves as offers, did not include important terms other than pricing, and were not the result of months of negotiations. In this case, other companies sent price quotations to the

Defendant along with the Plaintiff, and there were hundreds of transactions between the parties using the same forms. The facts here are much different than those in *Challenge Machinery* and these facts do not suggest the price quotations were offers under Michigan law.

The Plaintiff also cites *Plastech Engineered Products v. Grand Haven Plastics, Inc.*, 2005 WL 736519 (Mich. Ct. App. Mar 31, 2005), in support of its argument that its price quotations were offers. However, the court in *Plastech* presumed without analysis or discussion that the price quotations were offers. *Id.* at *4. Because the opinion provides no justification for its holding, the case offers nothing to persuade this Court of the merit of the Plaintiff's argument.

The Plaintiff's price quotations were not offers. However, under the preceding analysis, it is clear the Defendant's purchase orders were offers and they were accepted by the Plaintiff. Therefore, the terms of those offers became the terms of the agreement, including the term allowing the Defendant to terminate the agreements.

### D.     Defendant's Exercise of the Termination Clause

The Plaintiff argues that Defendant's exercise of the termination clause was not allowed by the parties' contracts. First, the Plaintiff argues that the duty of good faith and fair dealing prevented the Defendant from terminating the contract. Next, the Plaintiff argues that because the contract was a requirements contract, the Defendant could not terminate the contract, and was required to exercise good faith when determining its requirements. Finally, the Plaintiff argues that the purchase orders were intended to last for the life of the part.

**(1)** *Obligation of Good Faith and Fair Dealing*

Michigan Code § 440.1203, part of Michigan's Uniform Commercial Code (UCC), states, "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." Mich. Code § 440.1203. Because the obligation of good faith predates the UCC, and is not displaced by the UCC, under Mich. Code § 440.1103, common law contract analysis may be considered where appropriate. The duty of good faith and fair dealing does not prevent a party from using a termination clause fairly bargained for and included as a term in a contract. The doctrine of good faith and fair dealing protects the parties' reasonable expectations at the time they entered the contract and prevents a party from acting against those expectations to obtain an unfair benefit. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003) ("In recognizing an implied covenant courts have sought to protect the reasonable expectations of the contracting parties."). Thus, "where parties have unmistakably expressed their respective rights," the exercise of those rights does not defeat the reasonable expectations of the parties, and is not a violation of the duty of good faith and fair dealing. *Stephenson*, 328 F.3d at 827. This also applies to termination clauses, as stated by the Sixth Circuit, interpreting Michigan law in *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934 (6th Cir. 1989): "If properly bargained for, the right [to terminate a contract] is given full effect and may be exercised for any reason." *Id.*

Here, the objective intent of the parties, as expressly stated by the terms of the purchase orders, shows that the Defendant had the right to cancel the purchase orders at any time, if it gave written notice to the seller, the Plaintiff, and covered the Plaintiff's costs as required by the purchase orders. The Defendant's termination of all of its purchase orders with the Plaintiff cannot be said to have been incompatible with the reasonable expectations of the parties in light of the purchase

orders' termination clauses. The Plaintiff had to expect that it was possible for the Defendant to decide to terminate its purchase orders, as the Defendant bargained for the right to do so. The actual conduct of the parties does not suggest that the Plaintiff had some other expectation. The Plaintiff received hundreds of these purchase orders, continued to deal with the Defendant, and never objected to any of the terms of the purchase orders. The parties settled their claims under the termination clause after the Defendant terminated the purchase orders.

The Plaintiff cites the Michigan Supreme Court case *J.R. Watkins v. Rich*, 235 N.W. 845 (Mich. 1931), in support of its argument that the Defendant violated the duty of good faith and fair dealing by terminating its contracts with the Plaintiff. The Plaintiff argues that under *Watkins*, "where a party's discretion to terminate an agreement is unlimited, Michigan law imposes upon that party a duty to act with good faith in exercising such discretion." (Pl. Resp. 3, DE 102.)

This statement of Michigan law is incomplete, as it ignores the cases clearly stating that the duty of good faith and fair dealing does not alter the express and unambiguous terms of a contract. Also, while *Watkins* may be read to support the Plaintiff's position that an unlimited termination clause is limited by the duty of good faith, later cases analyzing the decision have found *Watkins* to stand for a different proposition. The Sixth Circuit in *Cloverdale*, 869 F.2d at 938, considered *Watkins* and found that it held that the duty of good faith and fair dealing is violated by the exercise of a termination clause where good faith was lacking at the time the contract was entered into:

> Later decisions have indicated that the basis behind the *Watkins* decision was the lack of good faith on the part of the company at the time it entered into the suretyship contract. Accordingly, the courts have limited the good faith rule announced in *Watkins* to situations where one of the parties lacked good faith at the time he or she bargained for the termination right. If properly bargained for, the right is given full effect and may be exercised for any reason.

*Cloverdale*, 869 F.2d at 938. The duty of good faith and fair dealing does not affect a party's ability

13

to terminate a contract if it bargained for the right in good faith and the contract expressly provides for that right. Here, the purchase orders all contain a clause allowing the Defendant to terminate the contract without any limitation on the time or the purpose of the termination. The Plaintiff has not argued that the Defendant bargained for the termination clause in bad faith, and there is no evidence to support such an argument.

Because the termination clause was bargained for in good faith, and the clause is expressly stated in the parties' contracts, the Defendant's exercise of its rights under the termination clauses could not be bad faith.

**(2)** *Requirements Contract*

The Plaintiff offers an extended argument that because the purchase orders were requirements contracts, and requirements must be set by the purchaser in good faith, the Defendant was obligated to continue to purchase from the Plaintiff so long as it had requirements. As stated by Michigan Code § 440.2306, "A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith." *Id.* However, the Plaintiff's argument is not correct as the requirements clause is simply not relevant to this dispute. The Defendant's good faith obligation to set its required quantities at levels within the parties' expectation is not at issue. The Defendant is not claiming that its requirements were zero for all of the parts it ordered from the Plaintiff, which would raise an issue of bad faith; rather, the Defendant ended the contracts under the termination clauses stated in the purchase orders. The Defendant had a duty to purchase wire harnesses from the Plaintiff until it, in good faith, no longer required the wire harnesses or it terminated the contract as allowed by the purchase orders. There

is no conflict between a term allowing a party to terminate a contract and a term setting the quantity of product to be purchased at a party's requirements.

The cases cited by the Plaintiff in support of its argument are not convincing. First, it cites the court's statement in *General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp. 2d 861 (E.D. Mich. 2000), that "If, in bad faith or inconsistent with commercial standards of fair dealing, the [purchaser] exercised a unilateral right not to purchase seat frames or to terminate the purchase orders, the [purchaser] would be subject to liability for breach of contract." *Id.* at 873. However that statement was in the context of the court's analysis determining whether the contract at issue was a requirements contract. A termination clause was not at issue in that case. Here, a requirements contracts exists, and the Defendant was obligated to set its requirements in good faith, but the fact that the contracts were requirements contracts does not limit the Defendant's bargained-for termination rights.

Second, the Plaintiff cites the unpublished case *Plastech Engineered Products v. Grand Haven Plastics, Inc.*, 2005 WL 736519 (Mich. Ct. App. Mar. 31, 2005), which considered the same purchase orders at issue here. The Plaintiff argues that *Plastech* held that a requirements contract limits the discretion of a party to terminate a contract pursuant to a termination clause. However, unlike this Court, the *Plastech* court applied a battle of the forms analysis under Michigan Code § 440.2207, *Plastech*, 2005 WL 736519 at *5, and left it for the trial court to decide whether the termination clause was a term of the parties' contracts. *Id.* at *7–8. The *Plastech* court never directly addressed the question of whether a requirements contract can be terminated at will under a termination clause.

Third, the Plaintiff cites another unpublished case, *Metal One America, Inc. v. Center*

15

*Manufacturing., Inc.*, 2005 WL 1657128 (W.D. Mich. July 14, 2005). *Metal One* did involve a requirements contract containing a provision allowing termination by the defendant. The court held that the defendant acted in bad faith in violation of the requirements clause when it terminated the contract to avoid losing money. *Id.* at *6–*7. The court relied on *Plastech* and *Paramount* in reaching that conclusion. *Id.* The *Metal One* court also cited Michigan Code § 440.2306 and noted that it is bad faith to shut down a factory and reduce requirements to zero to curtail losses. However, the court did not give any reason why termination pursuant to an expressly stated right to terminate was not allowed, and it addressed the breach of contract claim without discussing the effect of the termination clause. Because this Court does not read *Plastech* and *Paramount* as addressing the issue of whether a clause allowing termination at any time is limited when it is contained in a requirements contract, and sees no reason why a requirements contract could not also include a clause making it terminable at will, the Court declines to follow the unpublished decision in *Metal One*.

None of the cases cited by the Plaintiff persuade the Court that the Defendant's termination of the purchase orders pursuant to the termination clause constituted bad faith. The termination of the contracts is justified by the fact that the termination clause was expressly included in the purchase orders and allowed for termination of the contracts, provided the Defendant gave notice and paid the Plaintiff for the costs stated in the purchase orders. The fact that this is a requirements contract is not relevant, as the Defendant does not rely on the requirements clause to justify its termination and does not argue its requirements were zero. Thus, the good faith limitations that apply to requirements contracts to ensure the purchaser sets its requirements in line with the expectations of the parties at the time of contracting are not at issue.

**(3)** *Ambiguity*

The Plaintiff's final argument is that evidence suggests the termination clause was really intended to provide a method by which the parties would wrap up business after the part was no longer needed, and that the differing interpretations make the termination clause ambiguous. The Plaintiff's evidence that the parties intended the purchase orders to last for the life of the part is the parties' course of dealing, the long-term pricing structure stated in the price quotations, and the fact that a requirements contract lasts as long as there are requirements.

"Where the language of a writing is not ambiguous, its construction is a question of law for the court and it is error to submit the matter to the jury." *S. C. Gray, Inc. v. Ford Motor Co.*, 286 N.W.2d 34, 45 (Mich. Ct. App. 1979). As succinctly summarized by the Sixth Circuit in *MLW Associates, Inc. v. Certified Tool & Mfg. Corp.*, 106 Fed. App. 307, 313 (6th Cir. 2004),

> Michigan law dictates that an unambiguous contract should be construed according to its "plain and easily understood" terms. Where a court determines ambiguity exists in a contract, Michigan law requires that a jury determine the terms of the contract. A contract is considered ambiguous under Michigan law if its terms "reasonably may be understood in different ways." Ambiguity will not be found by a court solely because a party to the contract interprets terms differently than the express definition provided in the contract. Technical or torturous constructions of a contract should be avoided under Michigan common law.

*Id.* (citations omitted).

The termination clause is not ambiguous and the contract cannot be read to support the Plaintiff's interpretation, as none of the Plaintiff's evidence suggest the termination clause only applied after a part was no longer required. The termination clause does not include any limitation on the time or purpose of termination, and the termination clause is not reasonably susceptible to the Plaintiff's interpretation that the clause could only be exercised at the end of a part's life. The contract provides no support to the Plaintiff's interpretation. The Plaintiff argues Michigan Code §

17

440.2202 allows the Court to look to the course of dealing and performance to explain the terms of the contracts. Even if the Court did ignore the integration clause and looked to evidence outside of the contracts, the course of dealing, the price quotations, along with the fact the purchase order was a requirements contract, do not create any ambiguity as to the termination clause. The Plaintiff's evidence suggests the normal course of conduct would be that the Plaintiff would sell the Defendant the parts for the life of the part, but no evidence suggests this normal course of conduct could not be terminated by the Defendant as expressly stated by the contract. The Plaintiff has offered no evidence that the Defendant did anything to suggest the termination clause was limited so that it could only be exercised after a part was no longer needed.

The Plaintiff argues that because some of the purchase orders contain both a termination clause and a termination clause for default, the general termination clause is ambiguous as to when it could be exercised. This argument is also unpersuasive. The general termination right was limited in that it obligated the Defendant to pay the Plaintiff for certain costs arising from the termination. The termination for default is not so limited, and termination for default would not obligate the Defendant to pay the Plaintiff anything. The termination clauses cover different situations and the Defendant's obligations depend on which termination clause is at issue. There is no ambiguity in the purchase orders' use of two termination clauses to cover two different situations.

Finally, the Plaintiff argues that the termination clause applies only to each purchase order, and does not apply to the entire overall requirements contract. However, there is no evidence of an overall requirements contract. At oral argument, the Plaintiff referenced a letter attached to its Complaint in which Defendant's employee, Mark Alvis, wrote to the Plaintiff that the Defendant intended to give business to the Plaintiff. The letter also asked the Plaintiff to wait until it received

the purchase orders before acting:

> As we go forward, and you prepare to make [sic] commit funds (outside of the usual risks you take in the normal course of doing business—and outside of any specific purchase orders we have/will issue to you), please communicate with us your intent before you act so we can give you the written permission to proceed (Purchase Order or some other written document).

(Compl., Ex. A, DE 1.) The letter is not evidence of an overall requirements contract. Rather, it points to the purchase orders as the documents governing the parties' contractual relationship. If an overall requirements contract existed, there is no evidence of it, and the Court has no way to determine what its terms were. The evidence submitted shows the parties' contractual relationship was governed entirely by the purchase orders, all containing terms allowing the Defendant to terminate without limitation to time or purpose by giving written notice. The Defendant exercised its termination rights as to all outstanding purchase orders when it notified the Plaintiff in writing it would no longer purchase parts from the Plaintiff and was shifting its business to a different supplier. ( Correspondence from Stephen Davis and Pamela Moore to Larry Smith, July 25, 2006, Pl. Ex. L, DE 102.)

### E.     Conclusion

Summary judgment must be granted on the Plaintiff's contract claims. The terms of the contract are those of the purchase orders used by the Defendant to offer to purchase wire harnesses from the Plaintiff. One term in the purchase orders unambiguously allowed the Defendant to terminate the purchase orders by giving written notice. The Defendant gave written notice, terminating all of the outstanding purchase orders. Because the duty of good faith and fair dealing does not alter the rights of parties that were bargained for in good faith and expressly stated in a

contract, the Defendant's exercise of its right to terminate was not bad faith. Also, the Court sees no reason why the fact that the contracts were for a quantity equal to the Defendant's requirements should in any way limit the Defendant's ability to exercise its bargained-for termination rights.

**ORDER**

There being no breach of contract by the Defendant, the Defendant's motion for summary judgment [DE 95] is GRANTED and the Plaintiff's contract claims are DISMISSED. However, the Plaintiff's claim for promissory estoppel remains pending. A telephone conference to decide how this case is to proceed is SET for Tuesday, June 27, 2006 at 1:30 PM before Judge Theresa L. Springmann. The Court will initiate the telephone call.

SO ORDERED on June 21, 2006

    S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT